328 F.2d 404
 Francis O. CLARKSON, Jr., Receiver of the Property of Credit Company, Inc., a North Carolina Corporation, Appellant,
v.
The FINANCE COMPANY OF AMERICA AT BALTIMORE, a Delaware Corporation, and Smart Finance Company, a North Carolina Corporation, Appellees.
 No. 9053.
 United States Court of Appeals Fourth Circuit.
 Argued October 3, 1963.
 Decided February 24, 1964.
 
 E. C. Stothart, Jr., Charlotte, N. C., for appellant.
 Ernest S. DeLaney, Jr., Charlotte, N. C. (Bradley, Gebhardt, DeLaney & Millette, Charlotte, N. C., on brief), for appellees.
 Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 The North Carolina usury law was invoked in this case, after its removal to the District Court from the North Carolina State court, by Francis O. Clarkson, Jr., receiver of the Credit Company, Inc. of Charlotte to recover double the amount of the interest, the prescribed penalty, paid by his company under a loan agreement with The Finance Company of America at Baltimore, Maryland. Concededly usurious under the North Carolina statute, the interest collected by Finance was not unlawful in Maryland, whose laws Finance pleads governed the transaction. A verdict was directed for Finance and an incidental codefendant, the Court finding that the agreement was made in good faith in Maryland. The receiver's appeal from this judgment, we think, cannot succeed.
 
 
 2
 The North Carolina statutory law involved in this appeal is as follows:
 
 
 3
 G.S. § 24-2. "Penalty for usury; corporate bonds may be sold below par. — The taking, receiving, reserving or charging a greater rate of interest than six per centum per annum, either before or after the interest may accrue, when knowingly done, shall be a forfeiture of the entire interest which the note or other evidence of debt carries with it, or which has been agreed to be paid thereon. And in case a greater rate of interest has been paid, the person or his legal representatives or corporation by whom it has been paid, may recover back twice the amount of interest paid in an action in the nature of action for debt. In any action brought in any court of competent jurisdiction to recover upon any such note or other evidence of debt, it is lawful for the party against whom the action is brought to plead as a counterclaim the penalty above provided for, to wit, twice the amount of interest paid as aforesaid, and also the forfeiture of the entire interest. * * *"
 
 
 4
 While there were several consecutive agreements, they may be considered as a single contract, for their pertinent terms are substantially identical. Credit was a North Carolina corporation and Finance was chartered by Delaware. The receiver, appointed by an appropriate North Carolina State court, was fully authorized to bring this action. No dispute exists in the facts.
 
 
 5
 Finance's only office was in Baltimore, Maryland; none of the officers or employees resided in North Carolina. Its business was the rediscounting of notes which local finance companies had discounted for automobile dealers. The notes represented the purchase price of automobiles and each was secured by a lien on a car. Credit initiated negotiations in 1947 to establish a rediscount line with Finance. For this purpose Credit had its President interview the officers of Finance in Baltimore. As a result, Finance sent an auditor to North Carolina to examine the notes offered by Credit and to ascertain its financial rating, but with no authority to consummate a contract. Upon completion of his investigation the auditor left with Credit a form of a proposed collateral loan agreement.
 
 
 6
 This agreement was later executed by Credit, mailed to Finance at Baltimore and afterwards approved by Finance's officers in Baltimore. It was then signed for Finance in Baltimore and mailed to Credit in Charlotte, North Carolina. Under the terms of the agreement Credit would assign the notes and the accompanying contracts to Finance and send the assignment and other papers to Finance in Baltimore. On receipt, Finance would advance to Credit 70% of the face of each note. The balance, less deduction of Finance's compensation and service charges, would be remitted to Credit upon full payment of the note to Finance. The compensation admittedly exceeded the lawful rate of interest in North Carolina. All documents pertaining to the agreement and each rediscounted note were kept by Finance in Maryland. No Finance employees were sent to North Carolina to perform any services under the agreement save that at intervals its auditors went there to examine the books of Credit relating to the loan account.
 
 
 7
 An express condition of the agreement was that it should not become effective until accepted by the authorized officers of Finance in Baltimore, Maryland. Moreover, Credit was altogether aware of the covenant that the validity and every other aspect of the transactions, as well as the rights of the parties, should be judged by the statutory and decisional law of Maryland. There is no evidence whatsoever of any attempt on the part of Finance to conceal the amount of interest or other sums charged Credit by Finance under the agreement. The Maryland law was adopted, the parties clearly understood, for the convenience, uniformity and simplicity achievable by having one law govern the activities of Finance throughout the several States of its operations.
 
 
 8
 Payments on the notes by the automobile purchasers were received at the office of Credit, which was required to remit these instalments to Finance daily, meanwhile holding such moneys in trust for Finance. Credit was endorser on the discounted notes and under the agreement was obligated to redeem promptly any of them found unsatisfactory by Finance.
 
 
 9
 In September 1959 Finance, as authorized by the agreement, revoked its consent for Credit to accept the note instalments. It then entered into an agreement with the Smart Finance Company, also located in Charlotte, to collect the notes and foreclose upon the security whenever required, transmitting all moneys directly to Finance. In 1960 Credit became insolvent and the plaintiff receiver assumed control of its affairs. He instituted the present action against Finance on April 26, 1960, joining Smart as codefendant.
 
 
 10
 A full and complete accounting by Finance of all moneys received under the collateral loan agreement between Finance and Credit was sought. Particularly, a declaration was asked that all interest payments received by Finance under the loan agreement were forfeited as usurious. An order was also prayed directing Finance to deduct the statutory penalty of double the sum of the interest payments from the balance of the indebtedness claimed from Credit. Finally, the complaint sought to require Smart to turn over to the receiver all moneys collected by it from the notes or accounts receivable of Credit and to enjoin Smart from further remittances to Finance.
 
 
 11
 Removal of the action to the Federal court was petitioned by Finance on May 5, 1960. 28 U.S.C. § 1441. Afterwards, the receiver moved to remand for lack of complete diversity of citizenship, inasmuch as the defendant Smart, like Credit and its receiver, was a citizen of North Carolina. Remand was denied and quite properly, we think. Removal was justified under 28 U.S.C. § 1441(a). Smart was an unnecessary and dispensable party, and its common citizenship with the plaintiff did not destroy the requisite diversity. The allegations of the complaint made no cause against Smart, who was shown to be merely a stakeholder and not a party in interest. Smart is therefore not a defendant to be counted in balancing the parties. Salem Trust Co. v. Manufacturers' Finance Co., 264 U.S. 182, 190, 44 S.Ct. 266, 68 L.Ed. 628 (1924).
 
 
 12
 Entirely correct, too, was the District Court's peremptory instruction of the jury in favor of the defendants. Aside from the provision in the loan agreement itself, North Carolina's rule on conflict of laws required this direction. The rule is reiterated in Bundy v. Commercial Credit Co., 200 N.C. 511, 157 S.E. 860, 862 (1931) (also reported in 198 N.C. 339, 151 S.E. 626; 202 N.C. 604, 163 S.E. 676):
 
 
 13
 "Moreover, it is a generally accepted principle that `the test of the place of a contract is as to the place at which the last act was done by either of the parties essential to a meeting of minds. Until this act was done there was no contract, and upon its being done at a given place, the contract became existent at the place where the act was done. Until then there was no contract.'"
 
 
 14
 Baltimore was that place. Interestingly, the contest in the Bundy case involved the question of whether North Carolina or Maryland usury law applied. Under circumstances paralleling those now before us North Carolina applied the law of Maryland. Of the exceptions to the general rule noted in the Bundy opinion the only one now urged by the receiver is that the loan agreement was made in a foreign State with the intent and purpose to evade the usury laws of the forum.
 
 
 15
 To constitute an intent to circumvent the usury laws of North Carolina her highest court has said the contract must have been executed in bad faith. Bundy v. Commercial Credit Co., supra, 200 N.C. 511, 157 S.E. 860, 864. "Bad faith" was later explicitly interpreted to mean "that the transaction involved was dishonestly conceived and consummated with knowledge of a fraudulent design or deception." Bundy v. Commercial Credit Co., 202 N.C. 604, 163 S.E. 676, 677 (1932). With the District Judge, to us it is indisputable that the record is wholly wanting in proof of wrongful intent. The agreement's direction that the entire transaction be measured upon the laws of Maryland was in no degree illegal, opposed to public policy, or offensive to good morals of either State.
 
 
 16
 Without the slightest proof of deviousness ascribable to Finance, the judgment of the trial court was in every respect called for.
 
 
 17
 Affirmed.